# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **LISA BAILEY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:09-CV-02467-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| ***Commissioner of Social Security***, | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER AND OPINION</u>[1]

Plaintiff Lisa Bailey ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73. [*See* Dkt. Entries dated 9/10/2009].  Therefore, this Order constitutes a final Order of the Court.

AO 72A
(Rev.8/8
2)

Security Act ("the Act").[2]  For the reasons stated below, the Court **AFFIRMS** the final decision of the Commissioner.

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on August 24, 2006, alleging disability commencing on August 1, 2005.  [Record (hereinafter "R") 103-08].  Plaintiff's applications were denied initially and on reconsideration.  [*See* R41-42].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R55].  An evidentiary hearing was held on November 6, 2008.  [R17-40].  The ALJ issued a decision on March 10, 2009, denying Plaintiff's application on the ground that she had not been under a "disability" at any time through the date of the decision.  [R6-16].

---

[2]      Title II of the Social Security Act provides for federal disability insurance benefits.    42 U.S.C. § 401 *et seq*.    Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim.  Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on March 26, 2009, making the ALJ's decision the final decision of the Commissioner.  [R1-5].

Plaintiff then filed an action in this Court on September 8, 2009, seeking review of the Commissioner's decision.  *Lisa Bailey v. Michael J. Astrue, Commissioner of Social Security*, Civil Action File No. 1:09-cv-02467.  [*See* Doc. 1].  The answer and transcript were filed on November 11, 2009, [*see* Docs. 4-5], and the Court heard oral arguments on March 4, 2010, [*see* Doc. 10].  The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS

### A.    *Administrative Records*

In a Disability Report, Plaintiff indicated that plantar fasciitis in both feet prevented her from working because she could not lift or stand or walk for long periods of time. [R143].  She reported seeing various doctors between 2003 and 2006 because of her plantar fasciitis.  [R145-46].  Plaintiff did not indicate that she was taking any medications.  [R147].

3

Plaintiff reported in a December 2006 adult function report that her condition affected her sleep position and woke her up at night because of the pain. [R163]. Plaintiff indicated that she could cook quick meals, but not multi-course meals, and that she relied on her son to help with chores. [R164]. Plaintiff stated that her condition prevented her from standing, walking, bending, squatting, kneeling, or reaching over her head. [R165]. Plaintiff reported being able to pay attention for as long as was needed, but also that she could not follow written instructions because she would get side tracked. [R167]. Plaintiff indicated that her doctor prescribed a cane around February 2006. [R168].

A March 5, 2007, Disability Report indicated that Plaintiff had difficulty walking, was wearing a foot protector on her right foot, and could not wear shoes. [R177]. A March 7, 2007, Disability Report - Appeal form indicated that Plaintiff's condition changed in that she had chronic foot sprain with pain and was diagnosed with glandis cyst in her left wrist, which caused great pain. [R180]. Plaintiff reported experiencing drowsiness and stomach cramps from the medication that she was taking. [R182]. A second Disability Report – Appeal form from August or September 2007 indicated that Plaintiff had back, neck, leg, hip, shoulder, hand, and arm pain as well as knee swelling and a Ganglion cyst in her left wrist. [R201].

4

In November 2008, Plaintiff reported taking the following medications: (1) Elavil once per day for pain; (2) Tylenol three times a day for pain; and (3) Albuterol and Advair for chronic asthma. [R210].

B. *Medical Records*[3]

On August 17, 2004, Plaintiff was diagnosed with ankle/foot pain, and a doctor recommended that she try over the counter medication and see her personal physician if the condition did not improve. The doctor recommended stretching exercises and a night splint. [R214].

On June 8, 2005, Dr. Erroll Bailey diagnosed Plaintiff with plantar fasciitis, mid substance,[4] based on tenderness, complaints of heel and arch pain, and unremarkable X-rays. [R229]. A July 20, 2005, medical note indicated that Plaintiff was not consistent with performing her stretching exercises. Dr. Bailey reiterated the importance of the stretching, and he put Plaintiff in a walking boot and told her to

---

[3]    Plaintiff also received treatment for asthma from at least 2005. [R342-50]. The Court does not summarize these records because they are not relevant to this Social Security appeal.

[4]    Plantar fasciitis is irritation and swelling of the thick tissue on the bottom of the foot. This definition, like all others in this Order (except where otherwise noted), was obtained from the National Institute of Health's MedlinePlus website. *See* MedlinePlus, http://medlineplus.gov.

stretch daily.  He also indicated that Plaintiff could continue to receive cortisone injections.  [R224].  An August 15, 2005, note indicated that the boot and stretching were not working, so Dr. Bailey gave Plaintiff a cortisone injection.  [R221].  On August 24, 2005, Plaintiff reported that the injection did not provide relief, so Dr. Bailey stated it was "now time for a MRI scan."  [R222].

Plaintiff started going to the Ankle & Foot Centers of Georgia on September 12, 2005, complaining of pain in both feet.  In five subsequent visits, Plaintiff continued to complain of pain.  [R273].  At this first appointment, Plaintiff was diagnosed with plantar fasciitis, bilaterally, which was aggravated by her occupation.  Plaintiff was given a cortisone injection, and her foot was strapped and padded to avoid abnormal pronation.  [R332].  Plaintiff received a cortisone injections again on October 3 and November 28 because she was complaining of bilateral foot pain.  [R330-31].

On January 9, 2006, Plaintiff continued to complain of heel pain (with the right being worse).  Dr. Joseph Giovinco stated that because the injections and other conservative treatment were not working, he would arrange for shockwave therapy and take Plaintiff out of work while she healed.  [R329].  Plaintiff was cleared for shockwave surgery on January 19.  [R327].  On January 23, 2006, Dr. Giovinco completed a health provider certification indicating that Plaintiff had foot surgery and

AO 72A
(Rev.8/8
2)

that she would be able to return to work on February 6, 2006. [R266, 269]. Dr. Giovinco noted in a separate form for short term disability benefits[5] that Plaintiff's physical impairment was "severe," but that he had inadequate information about Plaintiff's psychiatric impairment. [R268]. He later revised the return to work date to March 13, 2006. [R265].

After the shockwave treatment, Plaintiff indicated on January 30[6] that she experienced some relief, but that she was still in a good deal of pain. However, Dr. Giovinco believed that Plaintiff would continue to heal. [R327]. Dr. Giovinco noted that Plaintiff was doing quite a bit better on February 6, 2006, but he indicated that she needed to be limited in her ambulation because of residual pain. [R325].

Plaintiff was seen on March 13, 2006, by Dr. Giovinco who noted that Plaintiff was still having 30% residual pain. [R324]. On this same day, Dr. Giovinco completed a Statement of Continued Disability form for Hartford Life Insurance. [R238-39]. Dr. Giovinco noted that Plaintiff's January 23, 2006, surgery improved Plaintiff's condition. [R238]. Dr. Giovinco also indicated that Plaintiff should receive a handicap

---

[5]      Plaintiff apparently received short term and long term disability through 2007. [R21-22]

[6]      Office notes between January 30, 2006, and June 1, 2006, indicated that Plaintiff continued to experience pain. [R305].

AO 72A
(Rev.8/8
2)

parking permit due to a non-permanent disability stemming from an orthopedic condition.  [R297].

On March 20, 2006, Dr. Giovinco indicated that Plaintiff could return to work on April 10, 2006.  [R291].  This return to work date was revised on March 27, 2006, and Dr. Giovinco indicated that Plaintiff should return to light duty work between April 17 and May 15, 2006.  [R258].  Two weeks later on April 10, 2006, Dr. Giovinco indicated, however, that Plaintiff could return to work on June 6, 2006.  [R256].  After seeing Plaintiff on April 10, Dr. Giovinco indicated that Plaintiff was still having pain in her right foot and difficulty standing and walking for prolonged periods.  Plaintiff was told to continue with her range of motion exercises, and she was considered disabled and unable to return to work.  [R323].  In an April 13, 2006, disability form for Hartford Life Insurance, Dr. Giovinco did not indicate that Plaintiff had any psychiatric impairment.  He only listed plantar fasciitis as the impairment.  [R253-54].

A May 18, 2006, physical therapy progress note indicated that Plaintiff continued to experience significant pain in both her feet after two and a half weeks of therapy. The therapist indicated that Plaintiff should pursue other options, including orthotics, because the therapy did not seem to be helping.  [R304, 362].  Dr. Giovinco also saw Plaintiff on May 18 who continued to complain of "quite a bit of pain in both heels."

8

[R322].  Dr. Giovinco indicated that he would perform endoscopic plantar fasciotomy (surgical incision of the fascia) on her right foot to relieve pressure and the pull of the plantar fascia.  [R322].

Following the fasciotomy, Plaintiff complained of her foot throbbing on a June 15, 2006.  [R300].  Plaintiff was placed in compression dressing and a below-knee cast.  [R319].  Also, Dr. Giovinco completed another statement of disability form for Hartford, indicating that Plaintiff had severe pain on palpation, [R307], and she would be limited in her ability to stand and walk for three months, sit for one month, lift, carry, reach, push, pull, and drive for five months.  [R308].  Dr. Giovinco sent Plaintiff to physical therapy on June 29, 2006, because she was still having quite a bit of pain and soreness.  [R303, 318].

Dr. Giovinco called in a prescription for Motrin after Plaintiff requested it on July 7, 2006.  [R301].  On July 13, 2006, Dr. Giovinco indicated that Plaintiff had essentially good functioning in all areas in response to a question about her psychiatric impairment.  [R293].

9

On October 26, 2006, Plaintiff was seen for a knot on her left wrist, a problem that had existed at irregular intervals for five to six months. [R406]. Plaintiff was prescribed ibuprofen and referred to an orthopedist for cyst removal. [R407].[7]

On November 28, 2006, Dr. Charles Scott, a doctor of internal medicine, performed a consultative examination. [R431-34]. In the psychiatric portion of the report, Dr. Scott stated:

> The claimant denies complaints of nervousness with strangers, difficulty making decisions, poor memory, poor concentration, hopelessness, difficulty relaxing, frightening thoughts, family problems, sexual or sleeping difficulties *but complains of depression, excessive worrying and temper loss*. The claimant has never considered suicide and does not desire psychiatric assistance. . . .

[R432 (emphasis added)]. Despite these complaints, Dr. Scott noted that Plaintiff's mood and behavior were within normal limits, that she did not have trouble with concentration or memories, and that she was oriented. [R433]. Dr. Scott also reported that Plaintiff walked with a limp. [R432, 433]. He observed that Plaintiff did not need an assistive device. [R433].

---

[7]   After complaining of lower abdominal pain for three months, [R423], Plaintiff an X-ray on November 13, 2006, which revealed that Plaintiff had a 1.5 centimeter simply cyst in her left ovary. [R413, 574-77].

After making these observations, Dr. Scott determined that Plaintiff had bilateral fasciitis and attendant limitations in her range of motion.  Dr. Scott stated that "[s]ome consideration should be given to a MRI scan of the feet in view of the chronicity" and that "an updated evaluation by an orthopedic surgeon and psychiatrist would be of benefit."  Dr. Scott recommended that Plaintiff lose weight and that she make lifestyle changes such as exercising to improve quality of life.  Dr. Scott believed that Plaintiff would have problems with prolonged standing and excessive walking, but not with lifting or crouching.  He also believed that Plaintiff would not be limited in reaching, handling, or feeling.  He determined that Plaintiff's ability to maintain concentration and attention would not be impaired and that Plaintiff could remember, follow, and complete simple and complex instructions.  He did not think that Plaintiff would have a problem with adhering to a work schedule or meeting production norms.  Finally, Dr. Scott concluded:

> The claimant's long-term prognosis depends upon the results of the recommended diagnostic studies and consultative evaluations as well as modest weight loss.  Some consideration should also be given to a screening psychiatric evaluation as there appears to be a degree of chronic dysthymic disorder.

[R434].

11

On January 2, 2007, Dr. Abraham Oyewo, a non-examining doctor, completed a Physical Residual Functional Capacity Assessment, finding that Plaintiff could: (1) occasionally lift 50 pounds; (2) frequently lift 25 pounds; (3) sit, stand and/or walk for 6 hours in an 8-hour day; and (4) push and pull without limitations.  [R436].  He also determined that Plaintiff could: (1) frequently kneel, stoop, crouch, crawl, and climb ramps/stairs; and (2) occasionally balance and climb ladder/rope/scaffolds. [R437].  He also determined that Plaintiff should avoid exposure to fumes, odors, dusts, gases, and poor ventilation.  [R439].

Allen Carter, Ph.D., completed a Psychiatric Review Technique and determined that Plaintiff had a non-severe affective disorder (dysthymic disorder).  [R443, 446]. Carter indicated that Plaintiff had mild limitations in maintaining concentration, persistence, or pace, but he found no other limitations.   [R453].   Carter noted Dr. Scott's assessment of dysthymia, but he determined that it was not severe because Plaintiff did not have treatment or prescriptions for mental impairments and Plaintiff's daily living activities were limited by physical pain, not mental problems.  [R455].

On January 3, 2007, Dr. Paul Spiegl, an orthopedist, performed an examination for Plaintiff's worker's compensation claim.  [R457-60].  Dr. Spiegl reported that Plaintiff walked with a slow gait with apparent pain in her heels, she had swelling and

12

tenderness in the heel pad, she could not spread her toes, she walked on the tip toes of her right foot, and she complained "bitterly of pain with each step." [R458]. Plaintiff was diagnosed with: plantar fasciitis; achilles contracture; foot sprain/strain; and difficulty walking. Dr. Spiegl believed that these conditions were aggravated by Plaintiff's work activity, but he believed that Plaintiff's "subjective complaints exceed[ed] [the] objective findings." Since the prior surgeries had not worked, Dr. Spiegl did not recommend additional intervention, but he recommended a functional capacities exam. He finally assigned an impairment of 3% for the left lower extremity and 11% for the right lower extremity. [R459].

Plaintiff went to the Grady Orthopedic Clinic on April 9, 2007, complaining of a dorsal wrist ganglion, which was aspirated. Plaintiff was told to follow up as needed if there was a recurrence. [R469]. Plaintiff returned to Grady on April 11 and complained of persistent pain in her wrist as well as heel spurs. It appears that Plaintiff was given a prescription for the pain. [*See* R470]. Plaintiff received a handicap parking sticker on May 23, 2007. [R551].

On June 22, 2007, Dr. Paul Crank, a non-examining doctor, completed a Physical Residual Functional Capacity Assessment indicating that Plaintiff could: (1) occasionally lift 50 pounds; (2) frequently lift 25 pounds; (3) sit, stand, and walk

AO 72A
(Rev.8/8
2)

for 6 hours in an 8-hour day; and (4) push or pull without limitation.  [R473].  He found that Plaintiff could occasionally climb ladder/rope/scaffolds, but could frequently balance, stoop, kneel, crouch, crawl and climb ramps/stairs.  [R474].  He believed that Plaintiff should avoid exposure to fumes, odors, dusts, gases, and poor ventilation.  [R476].  Finally, without explanation, Dr. Crank did not credit Plaintiff's complaints about not standing, walking, or lifting.  [R477].

Dr. Rami Calis, a Grady doctor, examined Plaintiff on July 3, 2007, and noted that Plaintiff had pain on a level of 7 or 8 when wearing her walking boot and a pain level of 10 without the boot.  [R546].  Dr. Calis found that Plaintiff: (1) had pain on palpation of the plantar region; (2) mild pain on heel compression; (3) muscle power of 5/5 in tested groups; (4) greater pain on the right side; and (5) an affected gait.  [R547-48].  Dr. Calis prescribed Neurontin (an anticonvulsant drug that is also used to relieve pain), but informed Plaintiff that he had no additional treatments to offer her.  [R548].  Plaintiff was then referred to the Grady Pain Clinic because of chronic pain in her feet.  [R548, 550].

14

Plaintiff returned to Grady on October 17, 2007, for a follow up for asthma and plantar fasciitis.  Plaintiff was on Albuterol for asthma and Motrin/Elavil for the plantar fasciitis.  [R543].[8]

Plaintiff went to the emergency room on February 1, 2008, complaining of pain in her neck, shoulder, and back following a car accident.  [R567].  Plaintiff was assessed with cervical and lumbar strain.  [R568].  X-rays of the cervical spine and back were negative.  [R568-70].  Plaintiff reported having continued aches, spasms and back pain from her accident on February 13, 2008.  [R538].  Plaintiff continued to complain of neck pain in June 2008.  She was told to take pain medication (Motrin/Elavil) two times per day.  [R558].  Plaintiff reported that she was taking Tylenol arthritis and Elavil for her foot pain in August 2008.  [R557].  Dr. Loms diagnosed Plaintiff with plantar fasciitis and told her to continue with Tylenol.  Plaintiff was also diagnosed with controlled asthma.  Plaintiff was referred to neurology.  [R556].

On December 2, 2008, Dr. Jennifer Loms completed a Treating Physician Questionnaire in which she reported seeing Plaintiff twice.  [R580].  Dr. Loms

---

[8]     Plaintiff went to the Grady Dermatology Clinic on October 31, 2007, complaining of hair loss.  [R540].  Plaintiff was prescribed an ointment and doxycycline. [R541]. Plaintiff returned to the Grady Dermatology Clinic on March 28, 2008, and appears to have been diagnosed with very mild dry hair.  [R536-37].

AO 72A
(Rev.8/8
2)

diagnosed Plaintiff with plantar fasciitis and indicated that Plaintiff's prognosis was good. Dr. Loms indicated that Plaintiff had chronic foot pain, neck and back pain, and imbalance/stumbling, but Dr. Loms did not believe that these interfered with Plaintiff's memory, attention, or concentration. Dr. Loms noted that Plaintiff suffered from drowsiness as a side effect of medications. Dr. Loms then stated that Plaintiff could: (1) walk less than 1 block without pain; (2) sit continuously for 60 minutes; (3) stand/walk for 15 minutes; (4) sit for 4 hours in an 8-hour work day; (5) stand/walk for less than 2 hours in an 8-hour work day; and (6) carry less than 10 pounds frequently and occasionally. [R580-81]. Dr. Loms believed that Plaintiff would: (1) need to take unscheduled breaks; (2) need to elevate her legs at unpredictable times; (3) need to rest or lie down at unpredictable times because of medications; (4) have poor reliability in a work setting; and (5) have her persistence, pace, and ability to maintain attention compromised. [R582-83]. Finally, Dr. Loms indicated that Plaintiff would not be able to work, and that if she did work, she would be absent more than 4 times per month. [R583-84].

C.    *Evidentiary Hearing Testimony*

At the November 6, 2008, ALJ hearing, Plaintiff was 40 years old. [R37]. Plaintiff testified that she had completed the ninth grade and dropped out of high school

in the tenth grade.  [R20].  Her plantar fasciitis impeded her ability to lift, to bend, and to stand and walk for long periods of time.  It also affected her balance when walking and standing.  [R22-23].  She was always in pain whether she was sitting, standing or lying down.  [R24].  Plaintiff stated that her condition had worsened since 2005, [R23], even with the surgeries, [R30].  Although Plaintiff's insurance ran out, Plaintiff believed that there were no other procedures that could be done even if she had insurance.  [R28].  Plaintiff was taking pain medication, which disturbed her concentration.  [R30].

Besides the plantar fasciitis, Plaintiff described having pain in her shoulder, neck, spine, and lower spine, all of which arose after the foot problems.  [R31].  She was taking the following medications: Albuterol for asthma and Elavil and Tylenol for her feet.  [R35].

Plaintiff stated that during the day, she took her medicine, slept, got up, and watched television.  [R36].  Plaintiff indicated that she could walk and stand for five minutes.  [R37].

The vocational expert ("VE") testified that an individual with the following characteristics could perform the work of a telephone solicitor: (1) a 40-year old (2) with the ability to occasionally lift and carry 10 pounds, who could also

(3) frequently lift and carry less than 10 pounds, (4) stand and walk for a total of 2 hours in an 8-hour day, (5) sit with normal breaks for 6 hours in an 8-hour day, (6) push and pull without limits, (7) occasionally climb, and (8) frequently balance, stoop, kneel, crouch, or crawl, but who should (9) avoid exposure to fumes and poor ventilation, and (10) be limited to walking and standing for five minutes at a time. [R37-38]. The VE noted that the DOT listed the telephone solicitor job as semiskilled work, but he believed that this description was out dated because the job was now an unskilled job, *i.e.*, one that could be learned by the average worker in 30 days or less. [R38]. There were 3,500 of these jobs in Georgia and 225,000 in the national economy. [R38-39]. The VE added that if a person needed to elevate her feet, she still could perform the telephone solicitor job. [R39]. However, the VE stated that a person could not work if she needed to rest or lie down at unpredictable times during the day. [R39].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.   The claimant has not engaged in substantial gainful activity since August 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*).

18

. . .

3.    The claimant has the following severe impairments: Plantar Fasciitis and Reactive Airway Disease (20 CFR 404.1521 *et seq.*).

. . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

. . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except claimant is limited to occasional climbing and frequent balancing, stooping, kneeling, crouching, and crawling. Claimant must also avoid moderate/concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (Exhibit 21F). Additionally, claimant is limited to walking 5 minutes at a time and to standing 5 minutes at a time. She must also elevate her foot with a step stool under the desk.

. . .

6.    The claimant is unable to perform any past work. (20 CFR 404.1565).

. . .

19

7.   The claimant was born on January 9, 1968 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

. . .

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2005 through the date of this decision (20 CFR 404.1520(g)).

[R11-16].

The ALJ explained in relevant part that Plaintiff's mental impairments were not severe because: (1) Plaintiff declined any treatment offered to her; (2) the state agency psychologist found the mental impairment was not severe; and (3) Dr. Scott concluded

20

that Plaintiff did not have trouble with concentration, attention, following instructions, and following a work schedule.  [R12].   The ALJ adopted Plaintiff's subjective complaints that she: had trouble sleeping because of discomfort and pain; could not stand and walk for any period of time without pain; could not lift over five pounds; and could not squat, bend, reach, walk, sit, kneel, or climb stairs without discomfort.  [R11, 13].

The ALJ explained that Plaintiff's impairments were not disabling.  First, the ALJ noted that: (1) examinations showed full range of motion; (2) Plaintiff was not compliant with treatment; and (3) Plaintiff's doctors decided to treat her condition by allowing her to cope with the pain.  Also, the ALJ noted that the assessments of Plaintiff's treating physician - - Dr. Giovinco - - indicated that Plaintiff was not disabled.  The ALJ recognized that Dr. Giovinco allowed Plaintiff to get a handicapped parking permit, but he noted that Giovinco's records did not support a disability finding.  As for Plaintiff's surgery, the ALJ determined that it improved Plaintiff's condition and was not serious surgery in that it did not require hospitalization.  [R13].  Next, the ALJ noted that the consulting doctor's assessment - - Dr. Scott - - indicated that Plaintiff could engage in some work, which Dr. Oyewo supported.  [R13-14].  Further, the ALJ credited Dr. Spiegl's finding that Plaintiff over reported her pain

AO 72A
(Rev.8/8
2)

because this was supported by other doctors.  Finally, the ALJ assigned the opinion by Dr. Loms little weight because the restrictions that she gave Plaintiff did not have support.  [R14].

Although the ALJ determined that Plaintiff could not perform her past relevant work, [R14-15], he found that Plaintiff was not disabled because she could perform other work in the national economy.  [R15-16].  In making this finding, the ALJ first noted that Plaintiff could not perform a full range of sedentary work because of additional limitations that reduced the occupational base.  Despite this finding, the ALJ determined that Plaintiff could preform the work of the telephone solicitor (225,000 jobs in the national economy and 3,500 in the local economy) based on the VE's testimony.  [R15].  The ALJ recognized the conflict between the Dictionary of Occupational Titles ("DOT") and the VE's testimony regarding the skill level needed to perform the telephone solicitor job, but the ALJ credited the VE's testimony because the DOT description was "outdated."  [R16].

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).  The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity.  *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the claimant must prove that he is suffering from a severe impairment or combination of

23

impairments, which significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).   Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

AO 72A
(Rev.8/8
2)

"Substantial evidence" means more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Although framed as three issues, the Court finds that Plaintiff raises the following four arguments: (1) the ALJ failed to develop the record by seeking an MRI, an orthopaedic consultative examination, and a psychological consultative examination; (2) the ALJ erred by failing to consider the side effects of Plaintiff's medications;

26

(3) the ALJ violated Social Security Ruling 00-04p by failing to resolve the conflict between the VE testimony and the Dictionary of Occupational Titles ("DOT"); and (4) the ALJ erred by concluding that there were significant numbers of jobs that Plaintiff could perform.  [*See* Doc. 8 at 1-2, 15].   The Court discusses these claims of error below.

> A.   *Developing the Record / Consultative Examinations*

Plaintiff argues that the ALJ erred by failing to send Plaintiff to get an MRI as recommended by Dr. Scott.  [Doc. 8 at 11].  Plaintiff asserts that by failing to obtain this test, the ALJ could not make a finding about Plaintiff's true functional capacity level.  [*Id.* at 11-12].  Plaintiff also notes that Dr. Scott's statement about Plaintiff's mental condition required that the ALJ send Plaintiff for further testing.  [*Id.* at 12].

The Commissioner responds that the ALJ did not have any obligation to obtain a psychological evaluation because Plaintiff did not have limitations associated with a severe mental impairment and other evidence, including Dr. Scott's concentration finding and the state agency doctor's finding, supports the decision not to obtain a psychological consultation.  [Doc. 9 at 9-10].  As for an MRI, the Commissioner concludes that such a test was unnecessary because there was a full and fair record before the ALJ.  [*Id.* at 10-11].

AO 72A
(Rev.8/8
2)

"The ALJ 'has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision.' " *Robinson v. Astrue*, No. 09-12472, 2010 WL 582617, *5 (11th Cir. Feb. 19, 2010) (quoting *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007)); *see also* 20 C.F.R. §§ 404.1519a(b), 416.919a(b).   Therefore, the ALJ will have the claimant attend a consultative examination ("CE") or order tests when the necessary information cannot be gleaned from the records.  20 C.F.R. §§ 404.1512(f),404.1517, 416.912(f), 416.917.  The ALJ will only purchase tests or examinations that are "need[ed] to make a determination" about a plaintiff's disability.  20 C.F.R. §§ 404.1519f, 416.919f.

The Court concludes that the ALJ did not err by failing to order an MRI or to send Plaintiff to orthopedic and psychological consultative examinations.  Turning first to Dr. Scott's recommendation that Plaintiff be seen by an orthopedist, the medical record shows that Plaintiff was seen by Dr. Spiegl, who was an orthopedist, in January 2007, after the November 2006 recommendation by Dr. Scott.  [*See* R457-60].  As a result, the ALJ had an updated opinion from a consulting orthopedist as recommended by Dr. Scott.  There was therefore no error in failing to order an orthopedic consultative exam.

28

As for a psychological consultative examination, the Court concludes that substantial evidence supports the ALJ's implicit finding that psychological testing was unnecessary given the ALJ's determination that Plaintiff's depression was not severe. [R12].  Although Dr. Scott stated that "[s]ome consideration should [ ] be given to a screening psychiatric evaluation" [R434], the substantial record evidence did not indicate that a psychological examination was necessary.  First, as the ALJ noted, Plaintiff's abilities to concentrate, follow simple and complex directions, adhere to a work schedule, and meet production norms were not impeded by depression. [*See* R434, 453].  Second, the non-examining psychologist found Plaintiff's depression to be non-severe.  [R443].  Third, there is no evidence that Plaintiff was taking or was prescribed anti-depressants.  Fourth, Plaintiff declined to see a social worker in May 2006 because she was "coping adequately at [that] time."  [R372].  All of this evidence is substantial evidence in support of the ALJ's decision not to order psychological testing because there was sufficient record evidence to evaluate Plaintiff's mental impairment and therefore to make a determination about Plaintiff's disability status.

AO 72A
(Rev.8/8
2)

Finally, the Court concludes that sufficient evidence was present in the record for the ALJ to make a disability determination without an MRI.[9] All examining doctors

_____

[9]      Although the ALJ did not discuss why he did not order an MRI in his written decision, the issue was addressed at the hearing through the following exchange:

ALJ:          . . . . You say there's some doctor that's recommending an MRI, who might that be, of the foot?

ATTY:         That was the CE that Social Security sent her to. That would be Dr. Charles Scott . . . .

. . .

ALJ:          . . . . The doctors that were treating her never did an MRI of the foot. Is that correct? So I guess they didn't feel it was warranted?

ATTY:         [Plaintiff's] told me this morning she never had an MRI referral. That's correct.

ALJ:          I mean, I would assume that if those doctors felt they needed that they would have requested that.

              . . .

              No, but I'm talking about you had a surgeon and an orthopedist that were working on her and none of them have performed an MRI, so I can only assume that they didn't feel it was necessary.

ATTY:         I think that's reasonable.

30

found that Plaintiff was suffering from foot pain.[10]  These doctors attributed the pain to plantar fasciitis.  [*See, e.g.*, R229 (Bailey), R330-32 (Giovinco), R434 (Scott), R459 (Spiegl), R548 (Calis)].  The record was therefore not ambiguous regarding Plaintiff's foot pain.  While an MRI may have provided a different diagnosis of Plaintiff's underlying condition, it is not clear that the MRI was necessary for a disability determination given the information in the record relating to Plaintiff's foot condition.  Also, there is no indication that the doctors who provided medical opinions about Plaintiff's limitations were unable to do so without an MRI of Plaintiff's feet.  Those doctors who examined Plaintiff after Dr. Scott's recommendation also did not request

---

[R34-35].  The Court notes that despite the attorney's apparent concession that the MRI was not ordered by other doctors, this assessment of the record is not correct because Dr. Giovinco explicitly stated that an MRI would be needed.  [*See* R222].  Despite the ALJ's erroneous statement, which Plaintiff's attorney made no attempt to correct, there was sufficient record evidence to make a disability determination without the MRI as discussed in the main text.

Further even if the ALJ erred, this exchange indicates that Plaintiff's attorney invited the error by explicitly agreeing with the ALJ that it was reasonable to conclude that the doctors did not feel that an MRI was necessary.  *Cf. Tracy v. Astrue*, 518 F. Supp. 2d 1291, 1305-07 (D. Kan. 2007) (applying invited error doctrine to Social Security case).

[10]     The only naysayers were the unexplained opinions by the two non-examining doctors, who in contrast to the evidence of foot pain and medical corroboration of this pain, found that Plaintiff could walk and stand for 6 hours in an 8-hour work day.  [*See* R436-37, R473-77].

AO 72A
(Rev.8/8
2)

MRIs.  Further, the record shows that the ALJ accounted for Plaintiff's ambulation problems and complaints of foot pain in the very restrictive RFC, which  confined Plaintiff to sedentary work, precluded her from standing or walking for five minutes, and required her foot to be elevated.  [R12].  Thus, the record evidence was sufficient for the ALJ to make his disability finding without the MRI.  *See Savage v. Astrue*, No. 4:08-cv-522, 2009 WL 1664067, *5 (E.D. Ark. June 15, 2009) (finding ALJ did not err in failing to order an MRI where there was no showing what MRI would have revealed given that Plaintiff's impairment was undisputed); *Girard-Quick v. Astrue*, No. 08-cv-3004, 2009 WL 63001, *5-6 (E.D. Wash. Jan. 8, 2009) (finding no error for failing to order MRI despite doctors' recommendations where other doctors did not seek MRI); *Cunha v. Barnhart*, No. 01-cv-4114, 2003 WL 21033408, *7-8 (N.D. Cal. May 5, 2003) (finding no error in failing to order MRI where treating doctor declined MRI and other recent examining doctors were able to form an opinion of plaintiff's impairments without MRI).

Accordingly, the Court concludes that the ALJ **DID NOT ERR** by failing to seek further examinations or medical tests for Plaintiff.

32

B.      *Side Effects*

Plaintiff argues that the ALJ erred in failing to consider the side effects of her medications. [Doc. 8 at 13-14]. Plaintiff identifies the following evidence as showing that she suffered side effects: (1) Dr. Loms indicated that Plaintiff would suffer drowsiness and would need to lie down during the day as a side effect of her medications; (2) Plaintiff stated that her medications caused drowsiness and affected her concentration; and (3) the record was replete with references to medications that Plaintiff was taking. [*Id.* at 13]. Given these references to medications and side effects, Plaintiff asserts that the ALJ should have addressed them pursuant to SSR 96-7p and 96-8p, and it was error not to do so. [*Id.* at 13-14]. The Commissioner responds that the ALJ did not err in considering side effects from medication because the medical evidence does not indicate that Plaintiff complained about these side effects. [Doc. 9 at 14].

An ALJ must consider side effects in the disability decision process. *See* SSR 96-7p; SSR 96-8p. For instance, side effects are considered in determining a claimant's RFC. *See* SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as: . . . restrictions imposed by the mechanics of treatment (e.g., . . . side effects of medication[.]"). They are also considered in

33

evaluating an individual's credibility about symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(iv); SSR 96-7p. Given these requirements, side effects from medication "could render a claimant disabled or at least contribute to a disability." *Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981) (citing *Figueroa v. Secretary of HEW*, 585 F.2d 551 (1st Cir. 1978)). However, courts have determined that substantial evidence supports an ALJ's decision not to consider side effects when the medical record does not contain any complaints or concerns about side effects. *See, e.g.*, *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (holding that substantial evidence supported ALJ's determination that side effects did not present a significant problem because "the record did not disclose any concerns about side effects by the several doctors who examined and treated" claimant); *French v. Massanari*, 152 F. Supp. 2d 1329, 1338 (M.D. Fla. 2001) (finding no error in considering claimant's side effects where there was a "notable absence in [claimant's] medical records of any complaints by [claimant] about side effects of his medications" and there was no indication that "that any of the many doctors that examined and treated French was concerned about the potential side effects of his medications"); *Holley v. Chater*, 931 F. Supp. 2d 840, 850 (S.D. Fla. 1996) (stating that claimant's hearing testimony of drowsiness and dizziness as side effects without any other evidence was insufficient to

34

support a disability determination); *Crumpton v. Shalala*, 881 F. Supp. 547, 552-53 (N.D. Ala. 1994) (finding no error in application of the pain standard where there was no evidence in the record that Plaintiff complained of a side effect to his doctor).

The Court concludes that the ALJ did not err by failing to consider Plaintiff's side effects from medications.  Plaintiff points to three types of evidence to support her claim that the ALJ should have considered side effects: (1) Dr. Loms's December 2008 assessment that Plaintiff's medication would cause drowsiness; (2) Plaintiff's self report of side effects from medication; and (3) the multiple references to medications in the transcript.  [Doc. 8 at 13].  Despite this evidence, the Court finds that the ALJ did not err in omitting a discussion of side effects.

First, the mere reference to taking medication does not require a conclusion that Plaintiff was suffering from side effects from her prescribed medications.  *See Colon ex rel. Colon v. Astrue*, No. 8:08-cv-1191, 2009 WL 2997194, *9 (M.D. Fla. Aug. 24, 2009) (R&R) ("Any discussion of possible side effects from a prescribed drug does not constitute evidence of side effects actually experienced by Plaintiff."), *rejected on other grounds by* 2009 WL 2997187 (M.D. Fla. Sept. 18, 2009); *see also Farhat v. Sec'y of Health & Human Servs.*, No. 91-1925, 972 F.2d 347 (Table), 1992 WL 174540, *3 (6th Cir. July 24, 1992) ("Although [the doctor] listed the potential side effects of the

35

drugs in [plaintiff's] records, this is not medical evidence that [plaintiff] suffered from these same symptoms."). *But see Doss v. Barnhart*, 247 F. Supp. 2d 1254, 1259 (N.D. Ala. 2003) (taking judicial notice that medications plaintiff was taking caused the side effects about which she complained despite absence of evidence documenting side effects).[11]  As such, Plaintiff's list of medications is not enlightening on the issue of whether she suffered side effects from these medications.

Second, Plaintiff's reference to side effects at the administrative hearing and in the administrative disability report does not automatically require the ALJ to incorporate the side effects into the RFC.  As stated by the Eleventh Circuit,

> where an unrepresented claimant's hearing testimony raises a question as to the side-effects of medications, the ALJ has the special duty to elicit further testimony or otherwise make a finding in regard to such side-effects.  *Cowart*, 662 F.2d at 735.  In contrast, where a represented claimant makes a similar statement, but does not otherwise allege that the side-effects contribute to the alleged disability, the ALJ does not err in failing "to inquire further into possible side[-]effects." *Cherry v. Heckler*, 760 F.2d 1186, 1191 n. 7 (distinguishing *Cowart*).

---

[11]     The undersigned will not follow *Doss* by investigating the side effects from Plaintiff's various medications because substantial evidence - - *i.e.*, the absence of any notations about side effects in the medical record (including Dr. Loms's medical notes) - - supports the ALJ's decision not to account for side effects in his RFC determination.  Also, *Doss* appears to contradict other cases that have determined the absence of complaints about side effects is substantial evidence in support of the ALJ's decision.

36

*Pilnick v. Comm'r of Soc. Sec. Admin.*, No. 07-11789, 2007 WL 3122168, *1 (11th Cir. Oct. 26, 2007)). Prior to the proceedings in this Court, it does not appear that Plaintiff specifically sought to establish disability based on medication side effects, so the ALJ could not have erred according to *Pilnick*.

Third, even if Plaintiff had complained that her side effects supported her disability claim prior to these proceedings, the substantial medical evidence does not support a finding that Plaintiff's side effects from her medications contributed to a disability. The medical notes from Plaintiff's visits to doctors, hospitals, and clinics do not reference any complaints about medication side effects. As the cases outlined above indicate, this absence of evidence provides substantial evidence in support of the ALJ. *See, e.g.*, *Swindle*, 914 F.2d at 226; *see also Wilson v. Astrue*, 653 F. Supp. 2d 1282, 1296-97 (M.D. Fla. 2009). Instead, the record indicates that doctors continued to prescribe and Plaintiff continued to take pain medication for her plantar fasciitis without apparent complaint. The Court recognizes that Dr. Loms believed that Plaintiff would suffer drowsiness from her medications, [R580], but the ALJ properly rejected Dr. Loms's opinion. There is no other evidence about Plaintiff complaining of drowsiness in the medical record. Dr. Loms's own medical note does not mention that Plaintiff suffered from drowsiness because of medication. [*See* R556]. Simply put,

37

Dr. Loms's sole statement about drowsiness has no support in the medical record and is unexplained, allowing the ALJ to reject this opinion.  *Cf.* 20 C.F.R. §§ 1527(d)(3), (4), 416.927(d)(3), (4) (noting that medical opinion would be given weight if source provides support for the opinion and the opinion is consistent with the medical record).

Accordingly, the Court concludes that the ALJ **DID NOT ERR** in disregarding medication side effects.

C.      *Social Security Ruling 00-04p*

Plaintiff argues that the ALJ erred by failing to resolve the conflict between the VE testimony and the Dictionary of Occupational Titles ("DOT") as required by SSR 00-04p.  [Doc. 8 at 14-15].  The Commissioner appears to argue that the ALJ did not err because the ALJ properly relied on the VE's explanation for the conflict. [Doc. 9 at 15].

The Eleventh Circuit has held that "when the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT."  *Jones v. Apfel*, 190 F.3d 1224, 1229-30 (11th Cir. 1999).  Since the Eleventh Circuit's *Jones* decision, the Commissioner has issued Social Security Ruling 00-04p, which states that "[n]either the DOT nor the VE . . . evidence automatically 'trumps' " when there is a conflict between the VE and DOT.  *See* SSR 00-04p.  Instead, "[t]he adjudicator must resolve the conflict by

38

determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than the DOT information." *Id.* Some district courts in the Eleventh Circuit have opted to follow SSR 00-04p instead of the *Jones* decision and require the ALJ to inquire into conflicts between the DOT and VE. *See Leonard v. Astrue*, 487 F. Supp. 2d 1333, 1339 (M.D. Fla. 2007). However, the Eleventh Circuit has explicitly held in an unpublished decision that the *Jones* case remains binding law in this Circuit because Social Security Rulings do not bind courts and do not have the force of law. *See Miller v. Comm'r of Soc. Sec.*, 246 Fed. Appx. 660, 661-62 (11th Cir. 2007).[12] As a result, Eleventh Circuit "precedent establishes that the testimony of a vocational expert 'trumps' an inconsistent provision of the DOT in this Circuit." *Id.* at 662.; *Leonard v. Astrue*, No. 2:08-cv-871, 2010 WL 338099, *5

---

[12]   The Court recognizes that "[u]npublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007). The Court follows the *Miller* decision because its analysis is persuasive and is based on and consistent with a published Eleventh Circuit decision. *Cf. Corbitt v. Astrue*, No. 3:07-cv-518, 2008 WL 1776574, *5-6 (M.D. Fla. Apr. 17, 2008) ("Particularly in light of *Miller*, the Court is unwilling to view *Jones* as anything other than binding precedent."). The *Miller* decision also adheres to the Eleventh Circuit's published position that the Social Security Rulings are not binding on the federal courts. *See B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. 1981) (citing *Seagraves v. Harris*, 629 F.2d 385, 390-91 (5th Cir. 1980)). As a result, the Court concludes that the VE testimony about the skill level needed to perform a telephone solicitor job trumped the DOT's stated skill level for the job.

(M.D. Fla. Jan. 22, 2010) ("The magistrate judge's statement-'Under the Eleventh Circuit's decision in *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), the [vocational expert's] determination trumps the DOT description of the job'-remains a correct statement of the law.") (citing *Miller*, 246 Fed. Appx. 660).

The Court concludes that the ALJ did not err in his treatment of the conflict between the DOT and the VE.  There was a conflict between the VE's testimony and the DOT because the DOT listed the telephone solicitor job "as semiskilled," but the VE believed that it was "now unskilled work."  [*See* R38].  The ALJ recognized this conflict, but credited the VE's testimony because the DOT's position was outdated. [*See* R16].   By giving primacy to the VE's testimony, the ALJ's decision complied with the Eleventh Circuit case law.  *Jones*, 190 F.3d at 1228. Also, the VE complied with SSR 00-04p because he resolved the conflict between the DOT and the VE testimony by concluding that the VE's explanation of the inconsistency was reasonable, namely that the DOT description for a telephone solicitor was out dated.  Accordingly, the Court concludes that the ALJ **DID NOT ERR** in his treatment of the conflict between the DOT and the VE testimony.

40

D.     *Significant Number of Jobs in the National Economy*

Plaintiff argues that the ALJ's determination about Plaintiff being able to do only one job (telephone solicitor) is insufficient to show that a significant number of jobs existed in the national economy.  [Doc. 8 at 15].  The Commissioner responds that the ALJ did not err in finding that significant jobs in the national economy existed because the VE's testimony established that such a job existed.  [Doc. 9 at 15].

As outlined above, the Commissioner must determine at Step five whether a claimant "can make an adjustment to other work."  20 C.F.R. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).  The "other work (jobs) that [a claimant] can adjust to must exist in significant numbers in the national economy (either in the region where [the claimant] live[s] or in several regions in the country)."  20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); *see also* 42 U.S.C. § 423(d)(2)(A) (defining work which exists in the national economy as "work which exists in significant numbers either in the region where such individual lives or in several regions of the country").  Based on these requirements, the ALJ determines the existence of other work as follows:

> Work exists in the national economy when there is a significant number of jobs (*in one or more occupations*) having requirements which [claimants] are able to meet with [their] physical or mental abilities and vocational qualifications.  Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where

41

[claimants] live are not considered "work which exists in the national economy". [The Commissioner] will not deny [claimants] disability benefits on the basis of the existence of these kinds of jobs.

20 C.F.R. §§ 404.1566(b), 416.966(b) (emphasis added). The ALJ has the burden of providing evidence about the existence of other work in the national economy, and the ALJ "may satisfy this burden . . . through a VE's testimony" about the number of jobs that exist. *Brooks v. Barnhart*, 133 Fed. Appx. 669, 670 (11th Cir. June 1, 2005) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004); 20 C.F.R. § 404.1566(e)). The ALJ determines whether significant jobs exist in the national economy, not the VE. *Id.*

The Court concludes that the ALJ did not err in concluding that the Plaintiff could perform other work. First, that the ALJ only identified one occupation is not fatal to the ALJ's decision because the regulations specifically contemplate that a significant number of jobs can be found even if the plaintiff can only perform one occupation. *See* 20 C.F.R. §§ 404.1566(b), 416.966(b). Second, the evidence indicates that the telephone solicitor job existed in sufficient numbers both in this region (3,500) and nationally (225,000). [*See* R38-39]. Case law establishes that 3,500 jobs in a region and 225,000 jobs nationally constitute a significant number of jobs for the ALJ to determine that Plaintiff was not disabled. *See Brooks*, 133 Fed. Appx. at 671 (holding

42

that substantial evidence supported ALJ's finding that 840 jobs constituted a significant number in the national economy); *Allen v. Bowen*, 816 F.2d 600, 607 (11th Cir. 1987) (holding that substantial evidence supported ALJ's conclusion that a significant number of jobs existed where VE testimony showed that 174 positions existed in the area, 1,600 in the State of Geogia, and 80,000 nationally); *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (finding that 1,400 jobs in region was a significant number of jobs and citing cases that found the following number of jobs significant: 1,350, 1,266, 850-1000, 675, 500, and 174); *Daniels vo Apfel*, 92 F. Supp. 2d 1269, 1283 (S.D. Ala. 2000) (finding that 69 jobs in county, 650 jobs in State, and 65,000 jobs in national economy were significant).  As a result, the ALJ's finding that there was a significant number of jobs for Plaintiff to perform was supported by substantial evidence.

Accordingly, the ALJ **DID NOT ERR** in determining that Plaintiff was not disabled at Step five when he found that Plaintiff could perform the telephone solicitor position, which had a significant number of jobs in the economy..

## VIII. CONCLUSION

For all of the reasons discussed in detail above, the Court **AFFIRMS** the final decision of the Commissioner.  The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

43

**IT IS SO ORDERED and DIRECTED,** this the 13th day of September, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)